UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CASIMIR SIWAK, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 5350 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| XYLEM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Casimir Siwak brings this diversity suit against his former employer, Xylem Inc., alleging that it unlawfully terminated him in retaliation for exercising his rights under the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1 *et seq*. Doc. 1. With discovery closed, the parties cross-move for summary judgment. Docs. 51, 53. Xylem's motion is granted and Siwak's is denied.

**Background**

Because the parties cross-move for summary judgment, the court ordinarily would view the disputed facts in the light most favorable to Xylem when considering Siwak's motion and in the light most favorable to Siwak when considering Xylem's motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). But because the court will grant Xylem's motion and deny Siwak's, the facts are set forth as favorably to Siwak as the record and Local Rule 56.1 permit. *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014). At this juncture, the court

1

must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

  A. **Siwak's September 2015 Injury**

In 2015, Siwak worked for Xylem as a "Performance Tester" at a facility in Illinois. Doc. 58 at ¶ 1. Because Siwak was a union member, the terms of his employment were governed by a collective bargaining agreement ("CBA"). *Ibid*.

While at work on September 8, 2015, Siwak walked into an overhead metal crane and injured his head. *Id*. at ¶ 5; Doc. 56 at ¶ 5. After receiving medical treatment, he returned to work that day and worked for about a month with some restrictions. Doc. 58 at ¶¶ 5-6. Siwak thereafter resumed working full-time and without restrictions. *Id*. at ¶¶ 6-7. He obtained workers' compensation benefits for the medical treatment related to his injury. *Id*. at ¶ 8.

Over the course of the following year, Siwak continued to complain of post-concussion symptoms and sought additional treatment. *Id*. at ¶ 9. In August 2016, based on an independent medical examiner's conclusion that his maladies were unrelated to the September 2015 accident, Xylem's insurance carrier notified Siwak that he would not receive workers' compensation benefits for subsequent medical treatment. *Id*. at ¶ 11. Siwak hired a workers' compensation attorney, Patricia Lannon, to assist him with appealing that determination and seeking an adjustment of benefits. *Id*. at ¶ 12. On October 21, 2016, while Siwak's claim for an adjustment of benefits was pending, he took a leave of absence from Xylem. *Id*. at ¶ 14.

  B. **The July 2017 Settlement**

Over the course of several months, Siwak and Xylem negotiated a settlement of his claim for an adjustment of workers' compensation benefits. *Id*. at ¶ 19. Both parties were represented by counsel, with Lannon representing Siwak and Shawn Biery representing Xylem. *Id*. at ¶ 17.

2

The parties reached an agreement in July 2017, and the Illinois Workers Compensation Commission approved the settlement a month later. *Id*. at ¶ 21.

During the negotiations, Siwak consistently took the position that "he was completely unable to work" and that "he would not return to work." Doc. 57-2 at p. 2, ¶¶ 6-7 (Biery declaration); *see* Doc. 58 at ¶ 19. In February 2017, Lannon tendered a settlement offer stating that Siwak would "consider a resignation from Xylem" in exchange for a "permanent total disability" payment. Doc. 57-2 at p. 7; *see* Doc. 58 at ¶ 19. The parties agreed upon a final lump sum payment in July 2017. Doc. 58 at ¶ 21. At some point before the negotiations concluded, Lannon told Biery that "Siwak desired to apply for unemployment benefits once he settled the claim and that he wanted to avoid signing a formal document indicat[ing] that he had resigned." Doc. 57-2 at p. 3, ¶ 8; *see* Doc. 58 at ¶ 20. At the time the parties reached an agreement, Lannon told Biery that "Siwak understood he would not be returning to work at Xylem upon settling the claim and that [Siwak] believed his employment had already ended." Doc. 57-2 at p. 3, ¶ 10; *see* Doc. 58 at ¶ 20.

Siwak objects to the admissibility of the statements that he and Lannon made during the settlement negotiations, arguing that: (1) they are hearsay; (2) they comprise "legitimate puffery" made in the course of bargaining; and (3) Evidence Rule 408 bars their admission. Doc. 58 at ¶¶ 19-20, 37. The objections are overruled.

First, Siwak's statements are non-hearsay because he is the party opponent of the party (Xylem) introducing them. *See* Fed. R. Evid. 801(d)(2)(A) (providing that a statement offered against an opposing party that "was made by the party in an individual or representative capacity" is not hearsay); *Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 825 n.4 (7th Cir. 1999) ("[S]tatements made by … the defendants … are not hearsay because they are made by

3

party opponents."). Lannon's statements are likewise non-hearsay because she made them while representing Siwak in connection with his workers' compensation claim. *See* Fed. R. Evid. 801(d)(2)(D) (providing that a statement offered against an opposing party that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay); *United States v. Swan*, 486 F.3d 260, 265 (7th Cir. 2007) ("We have previously held that '[a]n attorney may be the agent of his client for purposes of Rule 801(d)(2)(D).'") (quoting *United States v. Harris*, 914 F.2d 927, 931 (7th Cir. 1990)) (emphasis omitted).

Second, Siwak's and Lannon's statements regarding Siwak's understanding that he would not return to work at Xylem were not mere "puffery." Rather, those statements were factual assertions that Xylem was entitled to believe and rely upon in deciding how much Siwak should be paid in connection with his workers' compensation claim. *See* Ill. R. Prof. Conduct 4.1 ("In the course of representing a client a lawyer shall not knowingly[] … make a false statement of material fact or law to a third person … .").

Third, Siwak's and Lannon's statements are not inadmissible under Rule 408. The Rule states that evidence of "conduct or a statement made during compromise negotiations about the claim" is inadmissible if used "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a)(2). But the Rule adds that the court "may admit this evidence for another purpose," *ibid.*, such as "to show knowledge and intent," *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005). Moreover, "[t]he Rule's use of the singular term 'claim' suggests that settlement discussions concerning a specific claim are excluded from evidence to prove liability on *that* claim, not on others. That is, when a settlement discussion concerns Claim A, and statements from that discussion are later offered to prove or disprove liability on Claim B, Rule 408(a) does not make those statements inadmissible." *Wine & Canvas Dev., LLC*

*v. Muylle*, 868 F.3d 534, 541 (7th Cir. 2017). Siwak's and Lannon's statements during the workers' compensation negotiations accordingly fall outside Rule 408's prohibitory scope, as they are offered not to dispute the validity or amount of the workers' compensation claim, but rather to show for purposes of his present retaliatory discharge claim that Xylem genuinely believed that he had resigned in connection with the settlement of the workers' compensation claim. *See Zurich Am. Ins. Co.*, 417 F.3d at 689-90 (holding that Rule 408 did not apply where "the settlement communications at issue ar[o]se out of a dispute distinct from the one for which the evidence [was] being offered").

Emails exchanged among Xylem's agents in the wake of the settlement reflect and confirm the parties' shared understanding that Siwak would not return to work at Xylem. Doc. 58 at ¶ 21. In August 2017, Biery emailed Xylem's insurance carrier, its consultant, and the person responsible for managing its workers' compensation claims (Amy Berkey) to say that Siwak "had refused to sign anything formal about resigning but his attorney said he understood there was no job to return back to—and he believed he had already been terminated." Doc. 57-2 at p. 8; *id*. at p. 3, ¶ 10; *see* Doc. 58 at ¶ 21. An email that month from Xylem's insurance carrier to Berkey likewise stated that Siwak "refus[ed] to sign a formal resignation letter/agreement[.]" Doc. 57-6 at p. 8; *see* Doc. 58 at ¶ 21. Siwak contends that communications among Xylem's agents are not admissible "to establish the terms of the settlement agreement." Doc. 58 at ¶ 21. Because Xylem does not offer the evidence for that purpose, but rather to show that it genuinely believed that Siwak was not returning to work, the objection is overruled as moot.

C. The August 2018 Return-to-Work Letter

In August 2018, Xylem entered into a modified CBA with Siwak's union. *Id*. at ¶ 22. The modified CBA included a new provision stating that employees who failed to return to work after an eighteen-month leave of absence would be terminated. *Id*. at ¶ 23. Shortly after the

5

modified CBA went into effect, Xylem human resources official Felicia Ingram generated a list of ten employees affected by the provision. *Id*. at ¶ 25. Siwak was on that list because Xylem's records at the time reflected that he was still on a leave of absence. *Id*. at ¶¶ 25, 29. Xylem sent letters to the affected employees notifying them of the date by which they needed to return to work to avoid being terminated. *Id*. at ¶¶ 24-25. Siwak's letter, dated August 30, 2018, stated that his employment would be terminated if he did not return to work by December 31, 2018. Doc. 52-2 at p. 6; Doc. 56 at ¶ 10; Doc. 58 at ¶ 30. The letter directed Siwak to contact Ingram with any questions. *Ibid*.

The return-to-work letter was the only communication—other than those pertaining to the workers' compensation claim negotiations and settlement—that Siwak received from Xylem after he went on leave in October 2016. Doc. 58 at ¶ 31. Upon receiving the letter, Siwak did not immediately contact his union or anyone at Xylem. *Id*. at ¶ 32. Instead, he waited until December 17, 2018 to contact Ingram to express his desire to return to work. *Id*. at ¶ 33.

After hearing from Siwak, Ingram consulted with Kimberly Stewart, Xylem's Human Resources Business Partner, and Kari Pederson, Xylem's Environmental Health and Safety Specialist. *Id*. at ¶¶ 22, 34-35. Ingram told Stewart and Pederson that she "thought that [Siwak] had resigned his employment some time ago as part of his workers' compensation settlement," and therefore that he "may have been sent a [return-to-work] letter in error." Doc. 57-5 at ¶ 9; *see* Doc. 58 at ¶ 35. Ingram asked Pederson to verify Siwak's employment status at Xylem. Doc. 58 at ¶ 36.

Based upon her review of Xylem's records relating to Siwak's workers' compensation settlement, including the emails from Biery and Xylem's insurer concerning the parties' settlement communications, Pederson determined that Siwak and Xylem in fact understood that

6

he would not return to work following the settlement. *Id*. at ¶ 37. Accordingly, Pederson, Stewart, and Ingram concluded that Xylem had sent the return-to-work letter to Siwak in error. *Id*. at ¶¶ 37-38; *see* Doc. 57-5 at ¶ 11 (Ingram declaration) ("The communications [that Pederson reviewed] confirmed that Mr. Siwak had resigned at the time of the settlement and that he understood he would not be returning to work at Xylem. The communications regarding Mr. Siwak's settlement also noted that he did not want to sign a formal resignation document because he wanted to seek unemployment benefits. Thus, we confirmed that Mr. Siwak had resigned, and his employment status in the system had been incorrect."); Doc. 57-6 at p. 3, ¶ 10 (Pederson declaration) ("The communications confirmed that Mr. Siwak had resigned at the time of the settlement and that he understood he would not be returning to work at Xylem. I suspected that the August 2018 return-to-work letter may have confused Mr. Siwak."); Doc. 57-3 at p. 4, ¶ 17 (Stewart declaration) ("[After Pederson reviewed Siwak's workers' compensation file,] … we realized that Mr. Siwak should not have been sent a return-to-work letter, because he had already resigned his employment as part of the settlement."). Siwak's Local Rule 56.1(b)(3)(B) response denies that he resigned in connection with his workers' compensation settlement and denies that Xylem sent him the return-to-work letter in error. Doc. 58 at ¶¶ 35, 37-39. But Siwak does not dispute that Pederson, Stewart, and Ingram *believed* that he had resigned and *believed* that the return-to-work letter had been sent in error, and because Siwak does not present any contrary evidence, the fact that they held those beliefs is deemed admitted.

Based on her and her colleagues' shared understanding that Siwak was not on a leave of absence but instead had resigned, Stewart sent Siwak a letter on January 3, 2019, stating:

> After further investigation we found that you reached a workers compensation settlement agreement on 7.17.2017 and it was approved by the Illinois Workers Compensation Commission on 8.8.2017.

7

>Therefore, your employment is terminated immediately effective 1.3.2019, based on the settlement agreement.

Doc. 57-3 at p. 118. After receiving that letter, Siwak filed a grievance through his union, claiming that he never signed any document stating that he was resigning in connection with the workers' compensation settlement. Doc. 58 at ¶ 43.

Upon receiving the grievance, Stewart attempted to determine why Xylem's records in August 2018 showed that Siwak was on leave rather than separated from the company. Doc. 57-3 at p. 4, ¶ 20; Doc. 58 at ¶ 39. Stewart learned that Berkey had been the primary contact for Siwak's workers' compensation claim and ordinarily would have been responsible for updating his records to reflect any change in his employment status. Doc. 58 at ¶ 39. Because Berkey left Xylem shortly after Siwak's claim was settled, Stewart surmised that the failure to update his employment status was "an oversight on [Berkey's] part." Doc. 57-3 at p. 5, ¶¶ 21-23; *see* Doc. 58 at ¶ 39. Siwak objects to Xylem's "statements regarding what [Berkey] did or why she acted in a particular way" as calling for "unfounded speculation." Doc. 58 at ¶ 39. The objection is overruled as moot, as the evidence of Stewart's investigation is offered only for the permissible purpose of showing that Stewart believed that Berkey mistakenly did not update Siwak's employment status, and not for the purpose of showing that Berkey in fact failed to do so.

Xylem denied the grievance, and Siwak hired counsel to press his claim further. *Id*. at ¶ 44. In light of Siwak's stated desire to return to work, Xylem permitted him to resume working on May 20, 2019, and—given that "the situation was caused by [Xylem's] unintentional error"—agreed to pay him the wages he would have received had he returned to work as of December 2018. Doc. 57-3 at p. 6, ¶ 26. After a few months back at work, Siwak retired from Xylem in August 2019. Doc. 58 at ¶ 47.

8

**Discussion**

"The general rule in Illinois is that an at-will employee may be discharged by the employer at any time and for any reason." *Paz v. Commonwealth Edison*, 732 N.E.2d 696, 700 (Ill. App. 2000). The Supreme Court of Illinois carved an exception to the general rule in *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357 (Ill. 1978), which recognized a common law cause of action for retaliatory discharge. That cause of action, now codified in the IWCA, is available to an employee who is "terminated because of his actual or anticipated exercise of workers' compensation rights." *Williams v. Off. of Chief Judge of Cook Cnty.*, 839 F.3d 617, 621 (7th Cir. 2016) (citing 820 ILCS 305/4(h)).

Siwak brings such a claim, alleging that Xylem discharged him in January 2019 because he had previously pursued and settled a workers' compensation claim. Doc. 1 at ¶¶ 1, 28-29. "To maintain a claim for retaliatory discharge, an employee must prove: (1) his status as an employee of the defendant before injury; (2) his exercise of a right granted by the [IWCA]; and (3) a causal relationship between his discharge and the exercise of his right." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012) (internal quotation marks omitted); *see also Paz*, 732 N.E.2d at 701. Xylem seeks summary judgment on the ground that no reasonable jury could find a causal link between Siwak's January 2019 termination and his prior filing and settlement of a workers' compensation claim.

"In resolving retaliatory discharge claims, Illinois does not apply the *McDonnell Douglas* burden-shifting framework commonly applied in federal retaliation cases." *Gordon*, 674 F.3d at 774. "Instead, to establish a causal relationship, [the employee] must affirmatively show that the discharge was primarily in retaliation for [his] exercise of a protected right." *Ibid*. (internal quotation marks omitted). "To do so, [the employee] must proffer[] sufficient evidence from

9

which a reasonable jury could infer that [his] employer was improperly motivated." *Ibid.* (internal quotation marks omitted). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Dotson v. BRP U.S. Inc.*, 520 F.3d 703, 707 (7th Cir. 2008) (quoting *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992)).

In arguing that a reasonable jury could find causation, Siwak relies primarily on the January 2019 termination letter. Doc. 51 at 4-5. As noted, the termination letter stated that, "[a]fter further investigation[, Xylem] found that [Siwak] reached a workers compensation settlement agreement," and that "[t]herefore[] [his] employment is terminated immediately effective 1.3.2019, based on the settlement agreement." Doc. 57-3 at p. 118. According to Siwak, a jury need examine only the letter to find that Xylem *necessarily* terminated him because he settled his workers' compensation claim. Doc. 51 at 4-5.

Siwak's argument rests on a faulty understanding of causation. For purposes of an Illinois retaliatory discharge claim, "[t]he causality requirement calls for more than a sequential connection—the filing [and settling] of a workers' compensation claim followed by termination." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994) (citing *Marin v. Am. Meat Packing Co.*, 562 N.E.2d 282, 286 (Ill. App. 1990)). Rather, "the ultimate issue to be decided is the employer's *motive* in discharging the employee." *Hartlein*, 601 N.E.2d at 730 (emphasis added). Xylem's termination letter does not itself show that its motive for terminating Siwak was to punish or retaliate against him for his bringing and settling a workers' compensation claim. To the contrary, in stating that the termination was "*based on* the settlement agreement" (emphasis added), the letter plainly and unequivocally conveyed that

Xylem was terminating Siwak because—as Pederson, Stewart, and Ingram had concluded—it believed that his separation from Xylem was a component of the settlement.

Siwak has another arrow in his quiver, arguing as follows: although Xylem believed (incorrectly) that he had resigned as part of the settlement of his workers' compensation claim, when it realized that he had not resigned, it fired him out of ire that it had paid him more to settle his claim than it would have paid had he not resigned. Doc. 59 at 3-5. In other words, Siwak submits that his termination was "retaliation for having negotiated a good deal" in the workers' compensation settlement. *Id*. at 4. The problem with this theory is no record evidence supports it. The inference Siwak seeks to draw—that Xylem fired him a year and a half after he settled his workers' compensation claim because it realized that it had received the short end of that bargain—is too speculative to allow a reasonable jury to find a causal relationship between his discharge and the settlement. *See Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 934 (7th Cir. 1993) ("[T]he inference that [the employer] hatched an elaborate plot to get rid of [the employee] a year and a half after he filed his claim is too speculative to justify a rational finder of fact in concluding … that, more likely than not, [the employee] would not have been fired had he not filed a workers' compensation claim."); *Paz*, 732 N.E.2d at 595 (in holding that the employee had not established causation, reasoning that he was discharged more than two years after he began receiving workers' compensation benefits, and that he had not reported to work for approximately five months at the time he was fired); *see also Coleman v. City of Peoria*, 925 F.3d 336, 345 (7th Cir. 2019) ("Although [the non-movant] is entitled to have all reasonable inferences drawn in his favor at this stage, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (internal quotation marks omitted).

The only reasonable inference that could be drawn from the record is that Xylem genuinely believed that Siwak had resigned as part of his workers' compensation settlement, and that Xylem terminated him upon concluding that its records in August 2018 incorrectly reflected that he was on a leave of absence rather than separated from the company. When Xylem mailed Siwak the return-to-work letter in August 2018, Siwak had not worked for Xylem, and Xylem had not sent him any communications (other than those pertaining to his workers' compensation claim), for nearly two years. After Siwak responded to the August 2018 letter in December 2018, Ingram reasonably suspected that it had been sent in error because Siwak had left the company as part of his workers' compensation settlement.

Pederson's review of the company's records concerning the parties' contemporaneous communications confirmed that suspicion. Among those records was the Biery email stating that Siwak "had refused to sign anything formal about resigning but his attorney said he understood there was no job to return back to—and he believed he had already been terminated." Doc. 57-2 at p. 8. Given those records, it is beyond reasonable dispute that Xylem sent Siwak the termination letter based on a sincere belief that he had separated from the company as part of the workers' compensation settlement. That genuine belief defeats the causation element of Siwak's retaliatory discharge claim. *See McCoy v. Maytag Corp.*, 495 F.3d 515, 523-24 (7th Cir. 2007) (affirming the district court's grant of summary judgment to the employer on a retaliatory discharge claim, and stressing that "all of the [defendant's] employees who were involved in [the plaintiff's] termination process" testified that they "believed they were carrying out an established [company] policy without regard for whether [the plaintiff] had filed a workers' compensation claim").

Siwak counters that Xylem's stated reason for terminating him was pretextual. Doc. 59 at 3-8. In support, he asserts that Xylem could not *reasonably* have believed that he had resigned because the workers' compensation settlement agreement did not include a "no re-hire" clause or otherwise contemplate his resignation. That argument misses the mark because, to show pretext, "a plaintiff must offer evidence to indicate that the employer did not *honestly* believe the reasons it gave for its action and is simply lying to cover [its] tracks." *McCoy*, 495 F.3d at 522-23 (internal quotation marks omitted) (emphasis added); *see also Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered reason is pretextual."). While Xylem's Human Resources personnel might possibly have been wrong to conclude that Siwak left the company as part of the settlement, their beliefs were eminently reasonable given the contemporaneous materials Pederson reviewed, and there is no basis in the record to conclude that their beliefs were insincere.

Siwak's final retort—that Ingram's, Stewart's, and Pederson's declarations as to their beliefs are "self-serving," Doc. 59 at 7—has no merit under settled precedent. *See McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) ("Our cases for at least the past fifteen years teach that 'Self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment.'") (quoting *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 459-60 (7th Cir. 2014)); *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we have repeatedly emphasized over the past decade, the term 'self[-]serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). Accordingly, Xylem has articulated a legitimate, non-retaliatory reason for terminating Siwak, and Siwak has failed to show that Xylem's reason was pretextual.

Because no reasonable jury, even viewing the record in the light most favorable to Siwak, could find that Xylem discharged him in retaliation for bringing and settling a workers' compensation claim, Xylem is entitled to summary judgment. *See Gordon*, 674 F.3d at 774-75 (affirming summary judgment on a retaliatory discharge claim where the employee failed to show that his discharge was improperly motivated and the employer offered a legitimate, non-pretextual reason for the discharge); *McCoy*, 495 F.3d at 522-24 (holding that, even assuming that the employee could point to some evidence of improper motive, his retaliatory discharge claim failed because the employer proffered a legitimate, non-pretextual reason for the discharge).

## Conclusion

Xylem's summary judgment motion is granted. Siwak's summary judgment motion accordingly is denied. Judgment will be entered in favor of Xylem and against Siwak.

June 14, 2021

_____
United States District Judge